IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| PAM BLACKBURN and ALAN SMITH, Individually and on Behalf of a Class of Similarly Situated Individuals,<br><br>        Plaintiffs,<br><br>vs.<br><br>CHAMPION PETFOODS USA, INC., and CHAMPION PETFOODS LP,<br><br>        Defendants. | **No. 1:18-cv-00038–JEG-SBJ**<br><br>**ORDER ON MOTION TO DISMISS** |

This matter is before the Court on a Motion to Dismiss, ECF No. 29, filed by Defendants Champion Petfoods USA, Inc., and Champion Petfoods LP (collectively, Champion). Plaintiffs Pam Blackburn and Alan Smith resist. Champion requested oral argument on its motion. The Court has considered this request in conjunction with the parties' briefing and finds no cause for further argument. See L.R. 7(c). The matter is ready for disposition.

## I.     BACKGROUND[1]

Champion Petfoods USA, Inc., is a pet food company incorporated in Delaware with its principal place of business in Kentucky. Champion Petfoods LP is a Canadian limited liability partnership wholly owned by Champion Petfoods USA, Inc. Champion formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold throughout the United States lines of premium dog food branded as Orijen and Acana. Champion has been sued in numerous state and federal district courts throughout the United States for alleged misrepresentations regarding its lines of dog food. Although the plaintiffs differ, the allegations often overlap, and in many cases the same groups of attorneys are litigating the same allegations in different suits.

---

[1] At the pre-answer motion stage, the Court must "accept 'as true the complaint's factual allegations and grant[] all reasonable inferences to the non-moving party.'" Park Irmat Drug Corp. v. Express Scripts Holding Co., 911 F.3d 505, 512 (8th Cir. 2018) (alteration in original) (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009)).

See e.g., Colangelo v. Champion Petfoods USA, Inc., No. 6:18-CV-1228, 2020 WL 777462, at *5 (N.D.N.Y. Feb. 18, 2020) (citing several "[o]ther courts considering similar allegations against Champion" in a suit involving many of the same attorneys as representing the Plaintiffs in the present case); Song v. Champion Petfoods USA, Inc., No. 18-CV-3205, 2020 WL 7624861, at *1 n.1 (D. Minn. Dec. 22, 2020) (collecting cases), appeal filed No. 20-3689 (8th Cir. Dec. 28, 2020).  The present suit is part of that wave of litigation against Champion.

Plaintiff Pam Blackburn, a resident of Mills County, Iowa, purchased Champion's Acana Singles Lamb and Apple dog food approximately once per month from February 2014 to February 2018.  Plaintiff Alan Smith, a resident of Polk County, Iowa, purchased Champion's Orijen Puppy, Orijen Original, Orijen Trundra, and Orijen Six Fish dog foods once or twice per month from August 2016 to October 2018.  Plaintiffs filed a putative class action against Champion on October 19, 2018, in the Iowa District Court for Mills County; and Champion timely removed to this Court on November 16, 2018, asserting jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332(d) and 1453.

On February 21, 2019, Plaintiffs filed an unresisted motion to stay, explaining that a parallel case was proceeding before the United States District Court for the Central District of California—Reitman et al. v. Champion Petfoods USA, Inc., et al., Case No. 2:18-cv-01736 (C.D. Cal.)—that raised many similar claims, was further advanced than the present case, and may guide how the present case was litigated.  This Court granted a stay until November 18, 2019, pending the resolution of Reitman in the Central District of California.  The stay was subsequently extended to March 2, 2020, based on a delay in the Reitman trial date.  However, the Reitman proceeding itself was then stayed pending an appeal of the district court's order denying class certification.  The Court therefore lifted the stay of the present case on March 5, 2020.

Plaintiffs filed their First Amended Complaint on May 1, 2020, alleging Champion has made numerous misrepresentations regarding the premium quality of its Acana and Orijen dog

food lines.  Plaintiffs assert these statements were misrepresentations because Champion should have known its dog food either contained or was at risk of containing heavy metals, Bisphenol A (BPA), pentobarbital, non-regional ingredients sourced from far-away suppliers, frozen ingredients, expired or "refreshed" ingredients, and "regrinds" made from previously prepared pet food.  First Am. Compl. ¶¶ 53–142, 149–86, ECF No. 28.  Plaintiffs also allege the dog foods did not contain advertised amounts of meat and fish.  They contend that consumers paid above-market prices for Champion's products in reliance upon these various misrepresentations.  Based on these allegations, Plaintiffs' First Amended Complaint raises nine claims: violation of the Iowa Consumer Frauds Act; violation of the Iowa Commercial Feed Law (ICFL); negligence; breach of express warranty under Iowa Code § 554.2313; breach of implied warranty of merchantability; fraudulent misrepresentation; fraud by omission; negligent misrepresentation; and unjust enrichment.  To be sure, Plaintiffs' lawsuit does not contend their dogs were harmed by Champion's products.  Instead, they allege that they, as dog food buyers, suffered an economic harm because they did not receive the product they believe they were promised.  See Pls.' Suppl. Br. 6, ECF No. 44.

On June 15, 2020, Champion filed a Motion to Dismiss Plaintiffs' First Amended Complaint.  Champion's motion first argues that Plaintiffs have failed to state a plausible claim under any of their nine counts because the mere assertion that Champion's products "'might' contain substances that 'might' harm unidentified dogs owned by unidentified people in unidentified ways is not enough" to allege a cognizable harm.  Defs.' Br. 7, ECF No. 30.  It further argues Plaintiffs have not pled facts showing Champion's statements are misleading and therefore fail to state a plausible claim on any of their legal theories.  In addition, Champion contends that Plaintiffs fail to state a claim under the ICFL because that statute does not provide a private right of action, that Plaintiffs' claim of negligence is barred by Iowa's economic loss rule, and that Plaintiffs' negligent misrepresentation claim must fail because Champion is not in the business

of supplying information.  Champion requests the Court dismiss Plaintiffs' First Amended
Complaint with prejudice and without the opportunity to amend.

On July 6, 2020, Plaintiffs filed a resistance to Champion's motion.  On July 13, 2020,
Champion filed a reply, reiterating the position that Plaintiffs' allegation of "a 'risk' that *some*
packages purchased by *someone* might have contained something harmful or *somehow* did not
comply with the labeling is no[t] . . . sufficient to allege an injury."  Defs.' Reply 2, ECF No. 37.
In advancing this argument in its reply, Champion cited for the first time the Eighth Circuit's
decision in Wallace v. ConAgra Foods, Inc., 747 F.3d 1025 (8th Cir. 2014), a case in which
consumers alleging misrepresentation by a food manufacturer were found to lack standing to
bring their putative class action in federal court.  On December 1, 2020, the Court requested the
parties submit supplemental briefing "directly address[ing] the issue of Article III standing and
the effect, if any, of Wallace" in this matter.  Order Add'l Br'g 2, ECF No. 43.  Plaintiffs and
Champion timely complied.  The matter is now fully submitted.

## II.   DISCUSSION

"[S]tanding . . . is a jurisdictional prerequisite and thus a threshold issue that [federal
courts] are obligated to scrutinize, sua sponte if need be."  Smith v. Golden China of Red Wing,
Inc., 987 F.3d 1205, 1208–09 (8th Cir. 2021) (citation and internal quotation marks omitted).
For this reason, questions of standing "must be resolved before reaching the merits of a suit."
Sanzone v. Mercy Health, 954 F.3d 1031, 1046 (8th Cir. 2020) (quoting City of Clarkson Valley
v. Mineta, 495 F.3d 567, 569 (8th Cir. 2007)).  Here, the Court must first evaluate whether
Plaintiffs have standing to proceed on one or more of their claims before reaching Champion's
arguments for dismissal under Rule 12(b)(6).  See Mineta, 495 F.3d at 570 (finding the district
court erred to defer on the question of a plaintiff's standing pending factual development of the
case and noting that, where standing is raised on a motion to dismiss, "the standing inquiry must,
as a prerequisite, be done in light of the factual allegations of the pleadings").

## A. Standing Principles

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" Red River Freethinkers v. City of Fargo, 679 F.3d 1015, 1022 (8th Cir. 2012) (quoting Allen v. Wright, 468 U.S. 737, 750 (1984), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)).  The doctrine of standing embodies the "irreducible constitutional minimum" of a justiciable case or controversy. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  Its requirements are no less applicable in the class action context, and "[a] putative class action can proceed as long as one named plaintiff has standing."  In re SuperValu, Inc., 870 F.3d 763, 768 (8th Cir. 2017) (citing Horne v. Flores, 557 U.S. 433, 446 (2009), and Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 (1977)).

To have standing to proceed in federal court, a plaintiff must present three elements: "an injury in fact, meaning the actual or imminent invasion of a concrete and particularized legal interest; a causal connection between the alleged injury and the challenged action of defendant; and a likelihood that the injury will be redressed by a favorable decision of the court." Sierra Club v. Kimbell, 623 F.3d 549, 556 (8th Cir. 2010) (citing Lujan, 504 U.S. at 560–61).  The first element—injury in fact—is at issue in this matter.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan, 504 U.S. at 560 n.1).  "An injury in fact must also be 'concrete.' . . . . A 'concrete' injury must be 'de facto'; that is, it must actually exist." Id. (citing Black's Law Dictionary 479 (9th ed. 2009)).  In other words, a concrete injury must be "real," not "abstract." Id. (citing Webster's Third New International Dictionary 472 (1991); Random House Dictionary of the English Language 305 (1967)).  "[T]ime and again the Supreme Court has reminded lower courts that

speculation and conjecture are not injuries cognizable under Article III." Annex Med., Inc. v. Burwell, 769 F.3d 578, 582 (8th Cir. 2014) (quoting Wallace, 747 F.3d at 1031)).

Champion's opening brief contends that Plaintiffs' First Amended Complaint fails to allege "any cognizable injury" sufficient to sustain any cause of action raised by Plaintiffs. Defs.' Br. 7–8, ECF No. 30.  Champion frames this argument as a challenge under Rule 12(b)(6), citing two Eighth Circuit decisions—O'Neil v. Simplicity, Inc., 574 F.3d 501 (8th Cir. 2009), and Briehl v. General Motors Corp., 172 F.3d 623 (8th Cir. 1999)—for the proposition that a plaintiff cannot state a claim for product misrepresentation based on a "mere inchoate 'risk' that a product might cause harm but has not done so yet." Defs.' Br. 7–8, ECF No. 30.  The Court is mindful that Champion's Rule 12(b)(6) attack is analytically distinct from the present standing inquiry, as a justiciable complaint and one stating a claim for relief are not co-extensive. See Carlsen v. GameStop, Inc., 833 F.3d 903, 909 (8th Cir. 2016) (reminding that "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action" (alteration in original) (quoting ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters, 645 F.3d 954, 960 (8th Cir. 2011))).  However, in its supplemental briefing, Champion raises the same argument as a challenge to Plaintiffs' standing. See Defs.' Suppl. Br. 1–2, ECF No. 46. Likening this case to Wallace v. ConAgra Foods, Inc., 747 F.3d 1025 (8th Cir. 2014), Champion asserts Plaintiffs' First Amended Complaint fails to allege a particularized injury sufficient to confer Article III standing.

The Wallace case is central to the Court's Article III standing analysis and warrants discussion.  There, a group of consumers brought a putative class action suit against ConAgra Foods in state court, claiming its Hebrew National beef products (notably, hot dogs) were not, as advertised, "100% kosher." Id. at 1027.  The plaintiffs alleged "ConAgra's representations that kosher is the 'New Organic,' a promise of food purity amid other products full of artificial ingredients, led them to pay an unjustified premium for Hebrew National's ostensibly kosher beef." Id.  According to the complaint, some of Hebrew National's products advertised as 100%

kosher included non-kosher ingredients.  Id.  The plaintiffs raised claims for negligence, deceptive trade practices, violations of various state consumer protection laws, and breach of contract.  Id. at 1027 n.1.  ConAgra removed the case and then moved to dismiss under Rule 12(b)(1) and 12(b)(6).  The district court granted the motion to dismiss, reasoning that the First Amendment prohibited federal courts from adjudicating the consumer's legal claims as to whether the products were kosher.  Id. at 1027.  However, on appeal, the Eighth Circuit declined to address the First Amendment question and focused instead on whether the plaintiffs had standing to sue.  Id. at 1029.[2]

The Wallace panel first considered and rejected ConAgra's argument that the plaintiffs had failed to assert a viable injury in fact.  Id.  The court explained that "if the consumers' complaint is accepted as true, [they] may have paid too much for Hebrew National products based on ConAgra's misleading representations," and "even . . . a few pennies" in economic loss could satisfy the requirement of "a concrete, non-speculative injury."  Id.  Thus, it proceeded to the question of whether the consumers had sufficiently pled an injury that was "particularized, and actual or imminent," reminding that "'mere speculation' that injury did or might occur 'cannot satisfy the requirement that any injury in fact must be fairly traceable to' the alleged source."  Id. at 1030 (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410–11 (2013)).  After observing that the consumers had not alleged "any of the particular packages of Hebrew National beef they personally purchased contained non-kosher beef," the Eighth Circuit determined they had failed to assert an actual and particularized injury:

> The Supreme Court has made it clear that standing must be particularized, meaning the alleged injury must affect the plaintiff in a *personal and individual* way.  In the context of defective products, it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect.

---

[2] The Eighth Circuit noted ConAgra removed the case asserting federal jurisdiction and then moved to dismiss, arguing the plaintiffs lacked Article III standing.  Wallace, 747 F.3d at 1027.  This Court notes the same apparent inconsistency in the present case.

> Without any particularized reason to think the consumers' own packages of Hebrew National beef actually exhibited the alleged non-kosher defect, the consumers lack Article III standing to sue ConAgra.  Accepting the consumers' various allegations, it remains entirely possible, maybe probable, that the packages of beef they personally purchased and consumed met the "strict" standards advertised by ConAgra.  Even supposing the 70% kosher quota meant some beef was improperly certified as kosher, the consumers give no reason to think *all* the beef marked as kosher under the quota did not meet kosher standards.  As we cannot discern from the complaint how many packages were tainted with non-kosher beef, it is unclear whether even a bare majority of Hebrew National packages were not kosher.

Id. at 1030–31 (internal quotations, citations, and footnote omitted).  On the face of the consumers' complaint, the court concluded it was "pure speculation to say the particular packages sold to the consumers were tainted by non-kosher beef, while it [wa]s quite plausible ConAgra sold the consumers *exactly what was promised*: a higher quality, kosher meat product."  Id. at 1031.

The parties dispute whether Wallace is controlling in this case.  Plaintiffs contend their claims against Champion are distinguishable from those raised by the consumers in Wallace because they have alleged Champion's dog food "*ubiquitously* contains heavy metals, BPA, non-fresh, and non-regional ingredients and . . . is made with formulas different than those advertised on the packaging."  Pls.' Suppl. Br. 5, ECF No. 44 (emphasis added).  According to Plaintiffs, they "do not allege that 'a poorly manufactured subset' of Champion's Dog Food caused their injuries, but rather that 'entire product lines' are falsely and misleadingly labeled."  Id. at 6 (quoting City of Wyoming v. Procter & Gamble Co., 210 F. Supp. 3d 1137, 1151 (D. Minn. 2016)).[3]  Champion counters that the language of the First Amended Complaint is "vague at best

---

[3] Plaintiffs also briefly argue that Wallace is distinguishable because they "are not, as the Wallace plaintiffs did, bringing a manufacturing defect case."  Pl.'s Suppl. Br. 6, ECF No. 44.  They say theirs is instead a "breach of warranty and misrepresentation-based case."  Id.  The Eighth Circuit confronted and rejected the same argument in Wallace, finding the consumers failed to allege a justiciable injury regardless of whether their legal claims were based on contract law, tort law, or a statute.  See Wallace, 747 F.3d at 1031 ("The consumers' effort to distinguish their case from a mine-run product liability case is unconvincing. . . . The consumers 'describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the [product] was not the flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling' beef products

and [insufficient to] nullify the overarching theme" that Plaintiffs' claims are based on a risk of injury and not an injury in fact.  Defs.' Suppl. Br. 6, ECF No. 46.  Champion notes that "[n]owhere in the 341 charging paragraphs [of the First Amended Complaint] . . . is there an allegation that the dog food that these Plaintiffs actually, personally purchased in fact contained the noncomplying ingredients or chemicals."  Id. at 2.

The parties' arguments appropriately reduce the Court's standing analysis to a single, dispositive issue: whether the allegations of the First Amended Complaint, taken as true, plausibly assert that Ms. Blackburn and Mr. Smith personally sustained an economic injury when they purchased Champion's dog food for their own dogs.  The Court now turns to this question.

### B.   Plaintiffs' Allegations

Because the elements of standing are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Mineta, 495 F.3d at 569 (quoting Lujan, 504 U.S. at 561).  Therefore, at the dismissal stage, the Court determines whether Plaintiffs have "Article III standing based on well-pleaded allegations alone."  Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis, 894 F.3d 959, 965 (8th Cir. 2018).  Similar to its review of a motion under Rule 12(b)(6), the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the [Plaintiffs]."  United States v. Metro. St. Louis Sewer Dist., 569 F.3d 829, 834 (8th Cir. 2009) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)).  A justiciable complaint must assert facts sufficient to support a plausible inference of standing.  See, e.g., Hawse v. Page, __ F.4th __, 2021 WL 3234293, at *2 (8th Cir. July 30, 2021) ("[A] plaintiff must allege sufficient factual matter, accepted as true, to support a reasonable and plausible inference that she satisfies the elements of Article III standing."); Auer v. Trans Union,

---

that *might* not be kosher, 'and thus worth less than represented, is fraudulent).'  Article III cannot be so easily fooled." (alterations in original) (quoting In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1016 (7th Cir. 2002))).

LLC, 902 F.3d 873, 878 (8th Cir. 2018) (finding a plaintiff's "'naked assertion' of reputational harm, 'devoid of 'further factual enhancement,' [fell] short of plausibly establishing injury" for purposes of Article III standing (alteration omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))); Miller v. City of St. Paul, 823 F.3d 503, 506 (8th Cir. 2016) (finding plaintiff failed to allege "facts that affirmatively and plausibly" supported standing for certain claims against city and officials).

Plaintiffs' First Amended Complaint alleges purchasers of Champion's Acana and Orijen product lines paid a premium price for Champion's dog food in reliance upon its packages' claims that the Acana and Orijen diets were "Biologically Appropriate," included "Fresh" and "Regional" ingredients, would "Nourish as Nature Intended," and would "Deliver Nutrients Naturally." See First Am. Compl. ¶ 10, ECF No. 28.[4]  Plaintiffs allege that these representations were misleading because:

> (i) Defendants' dog food was not sufficiently monitored for heavy metals or BPA; (ii) Defendants' dog food was at risk of containing heavy metals or BPA; (iii) Defendants' dog food contained a material amount of non-fresh ingredients, such as regrinds; (iv) that Defendants' dog food contained a material amount of non-regional ingredients; and (v) that Defendants' dog food was at risk of being adulterated by pentobarbital.

Id. ¶ 11; see also id. ¶ 147 (additionally alleging Champion's dog food did not contain advertised amounts of meat and fish).  None of the allegations in Plaintiffs' 100-page pleading assert that any of these defects were detected in the bags of dog food they personally purchased.[5]  Instead,

---

[4] The Acana line of dog food did not include the statement "Nourish as Nature Intended," and the Orijen line did not include the statement "Delivering Nutrients Naturally."  Both dog food lines contained the other two statements.  First Am. Compl. ¶ 188, ECF No. 28.

[5] Plaintiffs' closest approach to an allegation regarding the specific dog food they purchased comes in Footnotes 1 and 2 of their First Amended Complaint, which cite to an exhibit reporting the results of "Plaintiffs' own . . . testing that confirmed the presence of [heavy metals and BPA] in all Acana and Orijen diets tested."  First Am. Compl. ¶¶ 69 n.1, 91 n.2, ECF No. 28.  However, although "Plaintiffs' own" testing suggests testing performed by Ms. Blackburn and Mr. Smith on products they purchased themselves, Plaintiffs' Exhibit 2 displays data regarding several Acana and Orijen varieties that Ms. Blackburn and Mr. Smith did not buy, such as "Acana Regionals Wild Atlantic," "Orijen Regional Red Angus Beef," "Acana Regionals Meadowland," and others.  Compare id. Ex. 2, with id. ¶¶ 8–9.  An inference that Exhibit 2 and

the First Amended Complaint presents an account of alleged contamination, corner-cutting, and deficient quality control in Champion's manufacturing processes that may or may not apply to the products they purchased.  For instance, Plaintiffs allege that Champion failed to sufficiently "monitor" for heavy metals, BPA, non-fresh ingredients, and pentobarbital in their products, see, e.g., id. ¶¶ 54, 69, 72, 80, 86, 88, 91, 94, 96, 149, 161; but they do not allege that such failure caused contamination or non-conformity in the dog food they bought.  They describe shipments Champion received from a supplier allegedly containing beef tallow tainted with pentobarbital, see id. ¶¶ 159–84, but they do not allege that they purchased any of the affected products.  Plaintiffs allege "some production lots of Orijen contained up to 5-6% regrinds, while some Acana production lots contained up to 15-16% regrinds," id. ¶ 106, but they never allege that the production lots from which their personal bags originated contained an amount of regrinds or other non-fresh ingredients.  Further, Plaintiffs allege that Champion sourced 70% of its ingredients outside of Kentucky and 25% from outside the United States, see id. at ¶ 130, but they make no specific allegations regarding the provenance of the ingredients in the bags of dog food they bought for their dogs.

Plaintiffs do not deny that the focus of their First Amended Complaint is Champion's manufacturing processes, not the bags of dog food they personally purchased.  They also concede that, under Wallace, asserting "a product line contains a defect or that a product is at risk for manifesting this defect" is not enough to satisfy standing requirements.  Pl.'s Suppl. Br. 1, ECF No. 44.  Nevertheless, Plaintiffs contend their First Amended Complaint raises a reasonable inference that they have sustained a personal and actual harm.  They argue that because they have alleged Champion's dog food "ubiquitously contains" contaminated and

---

its incorporating footnotes describe bags of dog food personally purchased by Ms. Blackburn and Mr. Smith is unwarranted as such an inference would contradict Plaintiffs' specific allegations regarding the products they purchased.  Cf. Yellen v. Hake, 437 F. Supp. 2d 941, 953 (S.D. Iowa 2006) (noting parenthetically a court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the Complaint" (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295–96 (9th Cir. 1998))).

nonconforming ingredients, the Court must necessarily "infer that Plaintiffs suffered the injury they alleged."  Pls.' Suppl. Br. 5, ECF No. 44.

Although the Court is required to grant all reasonable inferences to Plaintiffs in determining whether they have plausibility alleged standing, Plaintiffs must first plead the "factual content that allows the court to draw [those] reasonable inference[s]."  Iqbal, 556 U.S. at 678; see also Hawse, 2021 WL 3234293, at *2 (requiring that an inference of standing must be "reasonable and plausible").  Upon a careful review of its 341 paragraphs, the Court concludes that the First Amended Complaint does not assert the "ubiquitous" contamination and mislabeling Plaintiffs describe in their supplemental briefing.  In actuality, what Plaintiffs have alleged is a "risk" that Champion's products contained heavy metals, see First Am. Compl. ¶¶ 11, 54, 70, 85, 316; a "risk" that the products contained BPA, see id. ¶¶ 11, 86, 92, 96, 98, 316; and a "risk" that the products contained pentobarbital, see id. ¶¶ 11, 149, 153, 155, 161, 185, 316.  Indeed, the central refrain of Plaintiffs' First Amended Complaint is that Champion's food "contained *and/or had a material risk of containing*" non-conforming ingredients and contaminants.  Id. ¶¶ 187, 191, 193, 199, 213, 218, 229, 246, 261, 283, 284, 285, 296–99, 309 (emphasis added); see also id. ¶ 198, 210, 212, 217, 275.  By couching their allegations in indefinite language, Plaintiffs come up short of establishing "*all* or even *most*" of Champion's dog food suffered the defects they describe, Wallace, 747 F.3d at 1030, and so they fail to raise a reasonable inference of injury, cf. Doss v. Gen. Mills, Inc., No. 18-61924-CIV, 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019) (dismissing the plaintiff's product defect complaint, finding it failed to allege an injury sufficient for standing where the plaintiff "hedge[d] her bets, saying that the Cheerios she herself purchased either contained or *could contain* glyphosate" (internal quotation marks omitted)), aff'd, 816 F. App'x 312, 314 (11th Cir. 2020) (unpublished per curiam).

Plaintiffs cite various paragraphs in the First Amended Complaint as support for their argument that it pleads "ubiquitous" defects in Champion's dog food.  However, several of the

identified paragraphs include language limiting their scope to something short of ubiquity.  See, e.g., First Am. Compl. ¶ 91 n.2 ("Plaintiffs' own BPA testing that confirmed the presence of BPA in all Acana and Orijen diets *tested*.), ¶ 106 ("*some* production lots" of Orijen and Acana contained up to 5-6% and 15-16% regrinds, respectively), ¶ 112 ("Defendants *routinely* permitted the use of expired ingredients in the Alleged Premium Dog Foods."), ¶ 147 ("Defendants' recipes . . . have *consistently* used materially less than the advertised amount of meat and fish ingredients during the Class Period.") (emphasis added).  Other paragraphs identified by Plaintiffs make direct or indirect assertions about Champion's "Alleged Premium Dog Food," an unspecified usage which could either refer generally to the Orijen and Acana product lines or, more specifically, to the kibble in every bag.[6]  See First Am. Compl. ¶¶ 53, 56, 80, 81, 97, 103, 124, 125, 128, 131, 148.  Plaintiffs suggest they had the latter interpretation in mind when drafting their amended complaint.  See Pls.' Suppl. Br. 3–5, ECF No. 44.  However, reading the term "Alleged Premium Dog Food" as describing a uniform product with uniform deficiencies is not a plausible construction when Plaintiffs themselves allege the ingredients in Champion's dog food varied from batch to batch and diet to diet.  See, e.g., First Am. Compl. ¶ 106, ECF No. 28; see also Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (noting that, at the pleadings stage, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible").  "Alleged Premium Dog Food" cannot be read as "every bag of Champion's Orijen and Acana dog food" where Plaintiffs, perhaps intentionally, did not plead that language.  Rather, Plaintiffs have merely "allege[d] that a product line contains a defect or that a product is at risk for manifesting this defect," which is not enough.  Wallace, 747 F.3d at 1030 (emphasis in original) (citation and quotation marks omitted)).

---

[6] The First Amended Complaint vaguely defines the term "Alleged Premium Dog Food" as "Orijen and Acana" that was "formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold" by Champion "throughout the United States . . . during the Class Period."  First Am. Compl. ¶ 17, ECF No. 28.

Plaintiffs also point to Song v. Champion Petfoods USA, Inc., 2020 WL 7624861, a parallel lawsuit in which Plaintiffs contend Champion conceded an "identical" compliant adequately alleged an injury in fact under Eighth Circuit precedent.  Pls.' Suppl. Br. 2–3, ECF No. 44.  In Song, the District of Minnesota found that two dog food purchasers lacked standing to proceed on their BPA contamination claims because they did "not allege[] that they personally purchased dog food that contained BPA."  Song, 2020 WL 7624861, at *6.  However, distinguishing Wallace, the court determined that standing was satisfied for the remainder of the plaintiffs' claims because they had alleged that "all Champion dog food comes in packages that contain misleading claims."  Id. at *2 n.3.  It ultimately dismissed the case on grounds other than justiciability.  See id. at *4–12.

In Song, Champion's counsel acknowledged that the plaintiffs' allegations regarding heavy metal contamination appeared to "apply to every bag and so there would be Article III standing for some aspects of the claim."  Song Hrg. Tr. 61:5–8–Ex. 1 to Pls.' Suppl. Br., ECF No. 44-2.  Champion does not take that position in this action, see Defs.' Suppl. Br. 4 n.2, ECF No. 46, and Plaintiffs cite no authority to suggest Champion is estopped from arguing the First Amended Complaint fails to allege Plaintiff's own dog food was contaminated by heavy metals.  The Song court did not recite in its order which language in the complaint it found to allege that "all Champion dog food comes in packages that contain misleading claims."  Moreover, this Court is not bound by the construction another district court gives to a similar complaint.  All of Champion's packages are misleading only if all of Champion's dog food suffers from one or more of the defects Plaintiffs describe.  But Plaintiffs have not plausibly asserted that premise in their First Amended Complaint.  Song is therefore unpersuasive here.  Likewise, other district court opinions distinguishing Wallace are of little influence in this case because they featured allegations of universal product defects or personal harms to the plaintiffs.  See In re General Mills Glyphosate Litig., No. 16-cv-2869, 2017 WL 2983877, at *3 (D. Minn. July 12, 2017)

(finding standing in misrepresentation case where plaintiffs "alleged that all Nature Valley Products contain[ed] glyphosate"), appeal dismissed per stipulation, No. 17-2797 (8th Cir. 2017); Procter & Gamble, 210 F. Supp. 3d at 1151 (finding Wallace distinguishable where the plaintiff municipalities "repeatedly alleged that not-actually-flushable 'flushable' wipes [we]re clogging their water treatment facilities"), dismissed per stipulation, 0:15CV02101, ECF No. 1116 (D. Minn. Jan. 3, 2016); see also Fishon v. Mars Petcare US, Inc., 501 F. Supp. 3d 555, 565 (M.D. Tenn. 2020) (distinguishing Wallace in putative class action case against petfood company where, upon a "fair reading" the plaintiffs' Complaint "alleged that *all* IAMS Grain-Free Recipe bags are falsely advertised" based on "'independent testing' confirm[ing] that IAMS Grain-Free Recipe 'does, in fact, contain significant amounts of corn . . . and soy protein'").

Plaintiffs' reliance on the position Champion took in the Song case also must fail because even if the language of the First Amended Complaint could be stretched to allege that *all* Champion products contained *some* amount of heavy metals (or any other contaminant), it would still not be enough to plausibly allege the economic injury Plaintiffs assert.  This is because Plaintiffs have failed to allege that their dog food was contaminated with enough heavy metals to make Champion's packaging misleading, even by Plaintiffs' own terms.  Critically, Plaintiffs' lawsuit contends they were misled by Champion's bags not because those bags contained dog food with trace amounts of heavy metals, but rather that those bags may have contained more heavy metals than was "biologically appropriate" due to Champion's failure to monitor heavy metal levels in its ingredients and products.  See First Am. Compl. ¶¶ 54, 67, ECF No. 28.  The amount of heavy metal Plaintiffs propose is "biologically appropriate" for a dog to consume is not identified in their First Amended Complaint, but it is also immaterial to the Court's standing analysis.  All that matters for present purposes is that Plaintiffs have not alleged the dog food

they purchased contained more metal than Champion's packaging led them to expect.[7]  Even if

Plaintiffs have adequately alleged that all Champion dog food contains unmonitored heavy metal

levels, the First Amended Complaint leaves to conjecture whether all Champion dog food—and,

more importantly, the dog food Plaintiffs purchased—contains biologically *in*appropriate heavy

metal levels depriving consumers of their benefit-of-the-bargain.  "'Mere speculation' that injury

did or might occur" cannot satisfy standing requirements.  Wallace, 747 F.3d at 1030 (quoting

Clapper, 568 U.S. at 410–11).

Ultimately, the First Amended Complaint does not state the Champion dog food the

Plaintiffs received was anything other than "*exactly what was promised*: a higher quality . . .

product."  Id. at 1031.  Although it generalizes at length about the deficiencies in Champion's

---

[7] The First Amended Complaint states that government agencies have determined maximum safe levels of certain heavy metals for human consumption, but it does not allege that the levels in any of Champion's products exceeded those thresholds or even that similar thresholds apply to dog food.  See id. First Am. Compl. ¶¶ 60–61, 69 n.1, ECF No. 28.  Multiple courts have observed this flaw in similar lawsuits brought against Champion.  See Song, 2020 WL 7624861, at *5 ("It is simply not plausible to suggest that a reasonable consumer would read the phrase 'biologically appropriate' on a dog-food package . . . and understand Champion to be representing that it eliminated all traces of heavy metals from the dog food."); Simpson v. Champion Petfoods USA, Inc., 397 F. Supp. 3d 952, 972 (E.D. Ky. 2019) ("The fact that heavy metals naturally exist in organic proteins and in high concentrations in fish belies Plaintiffs' logic that Champion had a duty to disclose this information.  Champion did not claim that its products were free from any heavy metals and any inference to the contrary reads too much into Champion's representations." (internal citation omitted)); Weaver v. Champion Petfoods USA Inc., No. 18-CV-1996-JPS, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019) ("Plaintiff does not allege a comparative theory—that Defendants' products have greater concentrations of heavy metals than other pet foods, thus making the "premium" label arguably false.  Rather, he insists that the mere presence of heavy metals defeats Defendants' quality claims.  If this were true, the result would be truly preposterous.  No one would sell foodstuffs in Wisconsin.  If they had the audacity to claim that their products were "tasty," or "fresh," or in any other way of high quality, they would be quickly slapped with a [Wisconsin deceptive trade practices] lawsuit based on the lead, arsenic, mercury, and cadmium indisputably present in their products.").  Although these cases evaluated the claims against Champion under Rule 12(b)(6), their reasoning is persuasive for this Court's standing analysis.  Like the consumers in those other jurisdictions, Plaintiffs have failed to plead that the dog food they purchased contained more heavy metal than Champion's bags promised, and so they have not alleged an injury in fact under their benefit-of-the-bargain theory.

Acana and Orijen diets, the law in this circuit is clear: "it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that *their* product *actually exhibited* the alleged defect." Id. at 1030 (quoting In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 616 (8th Cir. 2011)); see also Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1157 (8th Cir. 2008) ("To have standing a plaintiff must demonstrate more than simply a generalized grievance." (citation and internal quotation marks omitted)).  Therefore, on the face of their First Amended Complaint, Plaintiffs have failed to present a concrete, particularized, and actual injury affecting them "in a *personal and individual* way."  Wallace, 747 F.3d at 1030 (quoting Lujan, 504 U.S. at 560 n.1). Plaintiffs lack standing as they do not present a justiciable case under Article III.  The Court is without jurisdiction in this case, and therefore does not address Champion's Motion to Dismiss under Rule 12(b)(6).  See Friedmann v. Sheldon Cmty. Sch. Dist., 995 F.2d 802, 804 (8th Cir. 1993) ("Without standing the federal courts are without subject matter jurisdiction to entertain [an] action.").

### C.  Disposition

Champion requests dismissal of Plaintiffs' action with prejudice.  Dismissal *without prejudice* is typically the appropriate remedy when a case originally filed in federal court cannot proceed due to a lack of standing.  Wallace, 747 F.3d at 1033 (citing Const. Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir. 2011)).  This case, however, was removed under CAFA, and the post-removal procedural requirements of 28 U.S.C. § 1447 apply.  28 U.S.C. § 1453(c)(1). Section 1447(c) provides, "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  "These words, 'on their face, give . . . no discretion to dismiss rather than remand an action'" upon a finding that subject matter jurisdiction is lacking.  Wallace, 747 F.3d at 1033 (quoting Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 89 (1991)); see also St. Louis Heart Ctr., Inc. v. Nomax,

Inc., 899 F.3d 500, 505 (8th Cir. 2018) ("[A] lack of federal jurisdiction does not obviate the remand requirement of § 1447(c), because state courts are not bound by the limitations of an Article III case or controversy.").  Plaintiffs' case must be remanded to the Iowa District Court from which it originated.

## III.    CONCLUSION

For the reasons provided, the Court finds Plaintiffs have failed to plead a justiciable case or controversy satisfying Article III's standing requirements and the Court lacks subject matter jurisdiction.  Accordingly, Defendants' Motion to Dismiss, ECF No. 29, is **denied as moot**. This case is **remanded** to the Iowa District Court for Mills County.

**IT IS SO ORDERED.**

Dated this 12th day of August, 2021.

JAMES E. GRITZNER, Senior Judge
U.S. DISTRICT COURT